In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-22-00325-CV**

**CARLOS SANCHEZ, Appellant**

**V.**

**LAURA SANCHEZ, Appellee**

_____

**On Appeal from the 418th District Court**
**Montgomery County, Texas**
**Trial Cause No. 22-07-08493-CV**
_____

## MEMORANDUM OPINION

Appellant Carlos Sanchez (Carlos or Appellant) appeals from a protective order issued by the 418th District Court, Montgomery County, Texas. The protective order was issued to protect Appellee Laura Sanchez (Laura or Appellee), Carlos's wife, from Carlos. In one issue, Carlos challenges the sufficiency of the evidence supporting the trial court's finding that family violence was likely to occur in the future. Finding the evidence sufficient to support the trial court's finding, we affirm the trial court's order.

## Background

On July 1, 2022, Laura filed An Application for a Protective Order (the Application). In the Application, Laura alleged that Carlos had engaged in conduct that constituted family violence and committed acts that were intended by him to result in physical harm, bodily injury, assault, or sexual assault or were threats that reasonably placed Laura and their children in fear of imminent physical harm, bodily injury, assault, or sexual assault. Among other things, Laura requested that the trial court issue a protective order prohibiting Carlos from committing certain acts against Laura and the children, granting Laura exclusive possession of Carlos and Laura's residence, and prohibiting Carlos from interfering with her use of community funds for the needs of her and their children. In the Application, Laura requested a Temporary Ex Parte Order, she alleged certain incidents where Carlos was aggressive and abusive from 2017 through 2022, and she signed an Affidavit in Support of Ex Parte Relief attesting to the allegations and attached it to the Application. On July 1, 2022, the trial court signed a Temporary Ex Parte Protective Order and Order Setting Hearing. Carlos filed an Answer to Application for Protective Order, wherein he specifically denied that he committed acts of family violence as alleged by Laura.

After a hearing, the trial court signed a Protective Order on July 14, 2022, prohibiting Carlos from: committing further acts of abuse or threats of abuse;

contacting Laura; committing an act against Laura that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places her in fear of imminent physical harm, bodily injury, assault, or sexual assault; communicating in a threatening or harassing manner with Laura; communicating a threat through any person to Laura; from communicating or attempting to communicate in any manner with Laura except through attorneys; going within 200 yards of Laura's residence; and removing the children from Laura's possession or from their child-care facility or school unless authorized by the court's possession schedule. The Protective Order also gave Laura exclusive use of the residence, gave Laura primary possession of their children, provided a possession schedule for Carlos's possession of the children, and required Carlos to enroll in, pay for, and complete a Battering Intervention Program. The duration of the Protective Order is until July 14, 2024.

Carlos filed a Request for Findings of Fact and Conclusions of Law and a Request for Past Due Findings of Fact and Conclusions of Law. On September 9, 2022, the trial court signed Findings of Fact and Conclusions of Law, finding the following:

> *Findings of Fact*
> 1. Applicant, Laura Sanchez, and Respondent, Carlos Sanchez, are married. They have two children: [O.S.] and [H.S.].
> 2. There is a divorce action pending in Cause No. 22-06-07817, *In the Matter of the Marriage of Laura Sanchez and Carlos Sanchez,*

3

*and In the Interest of [O.S.] and [H.S.], Minor Children*, In the 418th District Court of Montgomery County, Texas.

3. Respondent has a history of aggressive behavior toward Applicant and others.

4. Respondent has caused physical injury to Applicant on more than one occasion.

5. Various portions of Respondent's testimony were not credible[.]

6. Respondent has committed family violence.

7. Family violence is likely to occur in the future.

8. Good cause exists to prohibit communication between Applicant and Respondent.

9. Laura Sanchez should be awarded exclusive use of the marital residence[].

10. It is in the best interest of Laura Sanchez and the children (a) that Carlos Sanchez be prohibited from removing the children from the possession of Laura Sanchez and/or the children's child-care facility or school, (b) that Laura Sanchez be granted exclusive possession of the children, and (c) that Carlos Sanchez have supervised possession of the children under terms set forth in the Protective Order signed on July 14, 2022.

11. Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

*Conclusions of Law*

12. The live pleadings filed by Laura Sanchez are in due form and contain all the allegations required by law.

13. This Court has jurisdiction of the parties and of the subject matter of this case.

14. All legal prerequisites have been met.

15. The Protective Order signed on July 14, 2022, meets all of the requirements of Chapter 85 of the Texas Family Code.

16. A trial court may grant a protective order upon finding that family violence has occurred and is likely to occur in the future. In cases involving protective orders against family violence, evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue this behavior in the future. *Teel v. Shifflett*, 309 S.W.3d 597, 604 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing *Banargent v. Brent*, No. 14-05-00574-CV, [2006 Tex. App. LEXIS 1561], 2006 WL 462268, at 1-2 (Tex. App.—Houston [14th Dist.] Feb. 28, 2006, no pet.) (mem. op.)).

17. Any firearm permit possessed by Respondent is suspended during the duration of the Protective Order.

18. The Protective Order is valid for 2 years.

19. Any conclusion of law that is a finding of fact shall be deemed a finding of fact.

Carlos filed a Request for Additional Findings of Facts and Conclusions of Law asking the trial court to "make additional findings of fact from the record" that "support the finding that 'Family violence is likely to occur in the future.'" The trial court declined to make additional findings. Carlos filed a notice of appeal from the trial court's protective order.

Standard of Review and Applicable Law

Because the trial court acts primarily as the factfinder on request for family violence protective orders, we review the trial court's determinations under a legal and factual sufficiency standard. *In re M.G.M.*, 163 S.W.3d 191, 201 (Tex. App.—Beaumont 2005, no pet.) (citing *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000)); *Davis v. Cearley*, No. 09-12-00568-CV, 2013 Tex. App. LEXIS 8444, at **8-9 (Tex. App.—Beaumont July 11, 2013, no pet.) (mem. op.).

When a party attacks the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate on appeal that there is insufficient evidence to support the adverse finding. *In re M.G.M.*, 163 S.W.3d at 201. To conduct this review, we examine the entire record and consider and weigh all the evidence, both in support of, and contrary to, the challenged

5

finding. *Id.* (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989)). "We must uphold the finding unless the evidence that supports it is so weak as to be clearly wrong or manifestly unjust." *Id.* When a party attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that there was no evidence to support the finding. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). This Court is not a factfinder. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

When the trial judge is the factfinder, the trial judge is the sole judge of the weight and credibility of the evidence, is entitled to resolve any conflicts in the evidence, and may choose which testimony and witnesses to believe. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). In reviewing a no evidence issue, we view the evidence in a light most favorable to the finding, crediting favorable evidence if a reasonable factfinder could do so, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 807.

Section 71.004 of the Texas Family Code defines "family violence" in part as

an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault[.]

6

Tex. Fam. Code Ann. § 71.004(1). Section 85.001 of the Family Code provides as

follows, in pertinent part:

> (a) At the close of a hearing on an application for a protective order, the court shall find whether:
>     (1) family violence has occurred; and
>     (2) family violence is likely to occur in the future.
> (b) If the court finds that family violence has occurred and that family violence is likely to occur in the future, the court:
>     (1) shall render a protective order as provided by Section 85.022 applying only to a person found to have committed family violence[.]

*Id.* § 85.001(a), (b)(1). Section 85.022(b) of the Family Code provides that a court

may prohibit the person found to have committed family violence from, among other

things, communicating directly in a threatening or harassing manner with the person

protected by an order or a member of the family or household of the protected

person, as well as from going to or near the residence of the protected person or a

member of the family or household of the protected person. *See id.* § 85.022(b)(1),

(2), (3).

Evidence at Trial

Testimony of Laura

Laura testified that she married Carlos in 2007, and they were still married at

the time of the hearing. Laura testified that in February 2009 when she was nine or

ten months pregnant, Carlos was on the phone with his ex-girlfriend, Laura got upset

and slammed the door, and Carlos responded by "repeatedly punching [Laura] in the

7

head over and over." She described her injuries as "knots, just very tender head, and actually just more emotional." According to Laura, she did not call the police after the incident because it "would just make things worse[]" because it would anger Carlos and he would have to go to jail and "he's also the breadwinner, and [she] was a housewife[.]"

Laura testified that in November 2017, Carlos was out with friends drinking, came home late, and got upset with the dog. According to Laura, Carlos picked the dog up by the throat and carried it down the hallway, and when Laura went to grab Carlos's arm, he began hitting and kicking her for "taking up for a dog[.]" She testified that she was on the ground with her face covered and she was yelling, crying, and begging Carlos to stop. She testified she ran to her daughter's room and called Carlos's mother because she "was always the one that could control him." Laura testified that she told Carlos's mother that she thought Carlos was going to kill her and told Carlos's mother to come help her. Laura testified that her children were home at the time of the incident, but she did not call the police because she was scared.

Laura testified that in May 2021, Carlos had come home from work to eat lunch and he and Laura began arguing. According to Laura, the argument escalated, and Carlos took his plate and put it up to her throat while he had her arm pinned to the sink. Laura testified that she did not provoke Carlos, he left to go back to work

8

after the incident, and that the children were home during the incident. Laura testified that she did not call the police because she was afraid of "making [his] temper worse[,]" and she was a housewife "and did not want to affect his new job that he was really loving."

Laura testified that on July 17, 2021, she confronted Carlos about a week after she found a "cocaine bag" in his shorts while doing laundry after Carlos had come home from staying with his brother or mother. According to Laura, Carlos got angry and yelled and demanded that she not talk to anyone about it. Laura testified that the children were home, and she got scared and tried to leave to meet her friend, Hillary Gonzalez, to talk. Laura testified that when she tried to leave, Carlos screamed through the house, chased her to her car, and when she got in the car, he grabbed the door when the car was running, she told him to let her leave, he got mad and "went to grab [her] out of the car[,]" and she "slammed on the gas to avoid him pulling [her] out of the car." She testified that she did not call the police because she was "scared and just overwhelmed[,]" and she was trying not to interfere with his new job. A photograph taken by Laura of the green bag found in Carlos's shorts was admitted into evidence over the defense's objection.

Laura testified that early in the morning of August 9, 2021, she got up to let one of the dogs out and Carlos was sleeping on the couch. She had issues closing the solid, heavy, back door when she let the dog in and then went back to sleep. When

9

Carlos got up for work a couple of hours later, he was slamming doors and trying to make noise to wake her so she would know he was upset. She later asked him what was wrong, took his headphones off, and, when she turned to walk away, he threw the headphones at her but missed her and hit a picture frame. According to Laura, she ran from him, he chased her to the bedroom, and he pushed his way into the bedroom when she was trying to close the door. Laura testified that he was yelling at her, and she was scared and begged him to leave and go to work. She testified he left the room, Laura shut the door and said, "You don't even care if the kids hear[,]" and Carlos "ran through" the door, cracking the frame and knocking the door to the floor, and he "got in [her] face yelling at [her]." A picture taken by Laura of the broken door was admitted into evidence.

Laura added that on August 9, 2021, she called her mother who came to her home. But Laura agreed that she did not call the police because she "[does not] think it helps[]" because "[i]f a man is taken to jail for something like this, he won't stay in jail; so I did not want to deal with him being upset or the kids seeing him in a cop car or him losing his job." Laura testified that Carlos "was in [her] mother's face, threatened to call the cops, called her vile things, and Laura's daughter's friend's father had to remove Carlos from the house. According to Laura, she went with her children and dogs to a hotel and told Carlos's mother that she would not come home until Carlos was gone. Laura testified that while she was at the hotel, Carlos harassed

10

her and called her and her daughter and texted Laura repeatedly. Laura was not willing to tell him where she was because she was afraid he would show up at the hotel because "he's very erratic" and she "wouldn't be surprised if he killed [her]."

Laura testified that on September 30, 2021, Carlos had been staying with his brother for about a month, he showed up at his and Laura's home unannounced, and he convinced Laura to come outside. According to Laura she tried to go back inside, but Carlos grabbed the front doorknob and, knowing there was a security camera by the front door, started yelling, "You're hurting me[]" when Laura was not even near him. Then he would not open the door for Laura to go inside. Laura testified that the last "incident" was a month before the hearing when he blocked her, was yelling, and would not let her leave the room.

Laura testified that although Carlos has been living with his brother for over a year, he continues to show up at Laura's home unannounced. According to Laura, he is "very controlling[]" and she must "[d]o what [she's] told." Laura testified that Carlos controls their joint account, monitors the "allowance" he gives her, and she could not transfer money without his permission.

Laura testified that she and Carlos decided to divorce in April. When the temporary protective order issued the Friday before the hearing, Carlos told her she had fourteen days to get a phone, and he threatened to disconnect her phone. Text messages from Carlos to Laura threatening to restrict their funds from her were

11

admitted into evidence, and Laura described the messages as "dehumaniz[ing]." Laura testified that the week prior to the hearing, Carlos "cut off . . . all finances[,]" switched his payroll to a different account, and she had no income except $400 a month that she made doing "meal prep[.]" According to Laura, she was concerned that the protective order could be denied because "he's just going to keep doing what he wants[]" and that he has said that he "would make this divorce as bad as possible for [her]." Laura testified that if the protective order was denied she believed that future family violence would occur.

Text messages between Laura and Carlos were admitted into evidence in which Laura mentioned the incidents where he punched her, pinned her in the kitchen, and knocked down the door. Carlos did not deny the incidents referenced in these messages. When asked at trial how many incidents does she think there have been where she has feared for her safety or life, Laura answered, "My entire marriage. . . . [w]ell over fifty." When asked if she thinks Carlos is dangerous, she answered, "I think that when he's mad, there is no filter, and he doesn't control himself." On cross-examination, Laura testified that she did not have pictures of her injuries from the abuse, she did not call the police regarding the abuse, she did not have any text messages or emails from Carlos threatening to harm her because "[h]e's smarter than that[,]" and she agreed he has never threatened to physically harm the children.

<u>Testimony of Juany Sanchez</u>

Juany Sanchez, Carlos's mother, testified that she did not remember specific dates that Laura called her, but she agreed that Laura had called her several times before and said, "Come and get your son." Juany testified that on those occasions, she and her husband would go to Carlos and Laura's house, Carlos and Laura would be arguing, and Juany and her husband would try to calm them down. According to Juany, Carlos would calm down, but Laura would get angrier because she "felt safer" with Juany and her husband there.

Juany agreed she never saw anything physical happen between Carlos and Laura, and she did not recall Laura telling her that anything physical had happened. Even so, Juany testified that she had on occasion apologized to Laura and Laura's mother because they said Carlos had yelled at them. Juany testified that on one occasion she saw a "little scratch" near Laura's eye that Laura mentioned was from "Carlos throwing something," but Juany never saw bruising or a black eye on Laura's face. Juany testified that before Laura and Carlos were married, Laura told her about Carlos's anger, but that Juany had never known Carlos to get violent. Juany did not recall Laura ever telling her that she was taking the kids to wait on Juany to remove Carlos from the house, but Juany did remember Laura mentioning that Carlos had anger issues and that he was using drugs. Juany testified that one day Laura's mother called Juany and told her to go to the house because Laura and Carlos

13

were arguing. On another occasion when Juany was called, Juany tried to calm Laura and Carlos down when Juany got there, Laura said that she wanted to attack Carlos, and Juany made Carlos go back to Juany's home. According to Juany, Carlos had moved out of his house several times.

Testimony of Brenda Baker

Brenda Baker, Laura's mother, testified that she was familiar with Carlos and Laura's relationship and was around them often. Brenda testified that she had witnessed Carlos be verbally aggressive with Laura, and Brenda had witnessed bruises on Laura's arm. According to Brenda, in August of the year before the hearing, Laura called Brenda after "the door got mashed in[]" and Carlos's parents were there. Brenda came over and they all had a "powwow[,]" at that time "the finding of [Carlos's] drugs" had "come to light[,]" and they were all trying to "talk it out[.]" Brenda testified that Carlos was aggressive towards Brenda and "jumped at" her to get in her face, but Carlos's mother jumped between them to keep Carlos from approaching Brenda.

Brenda testified about several other incidents where Carlos lost his temper, which she said resulted in various acts of aggression. On one occasion that she described, she said Carlos lunged at her and "got very irate and aggressive." According to Brenda, "when [Carlos] loses his temper, you don't know what he's going to do." On another occasion at Laura and Carlos's house, Brenda recalled that

14

Laura and Carlos's dog accidentally scratched Carlos, Carlos "put the dog in a headlock[,]" and he punched the dog in the head. Brenda testified that, as to Laura's safety, Brenda has a "constant fear of whether he's just going to walk in the door and go irate" and that "as a mother, . . . it bothers [her] a lot."

Testimony of Carlos

Carlos admitted that he has smoked marijuana and used cocaine in the last few years. According to Carlos, he quit using cocaine once Laura confronted him about a year before trial. Carlos did not think Laura was lying when she testified that she found drugs in his shorts when she was doing laundry. Carlos agreed that he had written a letter to Laura apologizing about the cocaine use and problems it caused, and that when he was not staying at the house he went to the house and disposed of the letter. He testified that if he was given a drug test now, he would pass it.

According to Carlos, as to a couple of the incidents Laura testified to, he would voluntarily leave to prevent the situation from escalating, and that one occasion, Laura said she wanted to stab him. Carlos agreed that the children had witnessed the fights he had with Laura. According to Carlos, when they fight, Laura is very "forward moving, either physically or with words[]" and is "very persistent." Carlos testified that he sought counseling for his anger and had "15 to 20 sessions[,]" but that he did not currently need to participate in an anger management program because he "currently do[es] not have anger issues." On cross-examination, Carlos

15

acknowledged that early in the relationship he used to tell Laura that he was her master and she had to obey him, but he testified that he said that when they were dating and when he was a "young immature guy."

Carlos denied punching Laura in the head in 2009 when she was pregnant, denied pinning Laura against the sink with a plate held to her throat, denied throwing headphones at Laura in August 2021, yet he agreed he threw them "within 45 degrees[]" of her. Carlos testified that during that incident, he had followed her to the master bedroom, and he ultimately broke down the door to get into the room. Carlos agreed that in March 2022, he was in the master bedroom with Laura between her and the door, but he stated he was not blocking her from leaving but instead after she asked to leave, he "finally let her out. [He] was just wanting to speak with her."

As to an incident in June 2022, Carlos agreed he was with Laura in one of the children's rooms, but he denied yelling, explaining he wanted clarification as to why Laura sold a bed that he had purchased without informing him. He testified that he pushed her away while she was "trying to leave [and] walk through[.]" According to Carlos, although "incidents occurred" between the two of them, they were not as Laura described. He agreed that in the text messages where Laura listed the things he had done wrong, like hold a plate to her throat and punch her in the head when she was pregnant and knock down a door, his text response was that she should not list the things he did wrong. He agreed that in his text message when he responded

16

to the acts Laura listed, he never responded that the information she included was false. Carlos agreed that after he moved out, he would show up at the house unannounced, explaining it was his home. He agreed that on one of those occasions in September 2021, he stood between the door and Laura when she was trying to get inside.

As to the incident in February 2009 when Laura was nine or ten months pregnant, Carlos testified that Laura made accusations after Carlos told her that he had called his ex-girlfriend, Carlos got upset, Laura came towards him, "[got] in [his] face with a big old belly, [he] restrained her arms" because she was "pointing and getting aggressively in [his] face[,]" they physically struggled, and he "tr[ied] to catch her arms[]" but he said he "never intentionally punched her in the head or face as she claims." As to the April 2021 incident with the dog, Carlos testified that he has punished his dog several times by grabbing the dog's collar to drag the dog outside, but he denied picking the dog up by his throat, as Laura alleged. Regarding the July 2021 incident at the car in the front yard, Carlos testified that they were arguing, Laura got in the car with the door open, Carlos was standing between the open door and a large stone column, she told Carlos she had heard enough, she reached for the door to shut it, the car went in reverse and "smashed [Carlos] between the column and door." According to Carlos, he sustained bruises but did not take pictures of his injuries, and the car sustained damage. On cross-examination, Carlos

17

described his demeanor before she went to the car as "concerned[,]" and he agreed that his face was within a foot from her face and that he held the door that prevented her from leaving.

As for the August 2021 incident with the headphones, Carlos testified that Laura went out to let the dogs out early one morning, Laura "was just over and over slamming [the door] . . . waking [him] up." On cross-examination, when asked whether the door was difficult to shut, he answered "[i]f you do it right, it shuts well the first time. . . . [s]he's been living there for long enough to know how to shut the door." He woke up later to get ready for work and he agreed he woke her up. According to Carlos, a few minutes later he was doing his devotional Bible study in his recliner, "she was mouthing[,]" she grabbed the headphones from his head, threw them at his chest, and then cursed at him. Carlos testified he threw the headphones across the living room but did not throw them at Laura. Carlos agreed that after she cursed at Carlos, he broke the bedroom door down.

Text messages between Carlos and Laura in April 2022 were admitted into evidence, and Carlos testified that in the messages Laura was equally involved with the text messages and was "more aggressive[]" so it was not one-sided and it was not just him harassing her like she had characterized it. As to the incident on June 6, 2022, which was in one of the children's rooms, Carlos testified that he arrived to pick up the children as arranged, and he noticed that the bed was gone. When he

18

asked one of the children what happened to the bed, she said it had been sold. Laura refused to talk about it when Carlos questioned her outside, and he had "the right to know what's going to be sold" from their house because "she was a housewife[]" and "didn't work." According to Carlos, Laura had been "very self-righteous" the past year and "wouldn't talk to [him]." Carlos testified that the conversation moved inside because "[a]s [Laura] typically does, she just walks away and leaves me talking," and then she walked into one of the children's rooms. Carlos explained that he walked in behind Laura, shut the door, whispered because the children were in the house, while still seeking answers about what happened to the bed. According to Carlos, Laura refused to tell him what happened to the bed. Carlos explained, he was standing in front of the door when Laura "just attempted to walk through me which is typical of her[,]" so he put his hands up, she claimed that he pushed her when he did not, she asked him to let her out, and he opened the door so she could go. On cross-examination, Carlos agreed that he only gave Laura $175 a week for expenses, Laura had no substantial income, she had to ask for permission to spend anything out of the ordinary, and she did not have access to some of his accounts.

In the hearing, Carlos was also asked about Laura's temper, and he testified that when she lost her temper she would become violent. Carlos recalled that on one occasion, he woke up to Laura fighting with one of the children when she was getting the child dressed, and Carlos had to "go and actually grab Laura's shirt from behind

19

and pull her out of the restroom" because she had hit the child multiple times. According to Carlos, a couple of weeks after the broken-door incident, he tried to get Laura to go to the 12-week counseling course he attended about understanding anger, but she only went once. Carlos testified that he thought counseling would be a good for them so that they could coparent peacefully and move forward. Carlos added that over the past year he wanted to have a peaceful relationship with Laura outside of marriage, but that Laura's response has been, "Don't talk to me about kindness. Don't talk to me about peace."

Testimony of Hillary Gonzalez

Hillary Gonzalez testified that Carlos and her husband had been friends for about twenty years, and she and Laura were friends and had known each other for fourteen years. Hillary testified that she has lived with Carlos and Laura but that she is not there all the time and does not know everything that happens in the house. According to Hillary, she had been around Carlos and Laura on many occasions, and she had seen them "bicker" but not fight. She had never witnessed Carlos get aggressive or Laura or Carlos get loud and angry. Hillary testified that Carlos is good around the children and that "[h]is kids love him." Hillary testified that on one occasion, Laura discussed with her that Laura had lost her temper disciplining one child and Carlos had to hold Laura back. Hillary testified that Laura spoke with her about things Carlos did to her that she did not like, and she discussed abuse such as

20

"the grabbing, the holding, . . . him putting his hand on her and being rough." According to Hillary, Laura and Carlos had "hundreds" of confrontations and she would meet up with Laura so Laura could calm down. Hillary testified that although she had never seen "black eyes or anything of that sort[,]" she believed that Carlos "has put his hands on" Laura.

Testimony of Joanna Smith

Joanna Smith, the volunteer public relations coordinator for Mountain Mover Ministry, testified that she first met Carlos in October of the year before the hearing when he came to a Mountain Mover Ministry Bible study. Joanna testified that she would see Carlos once or twice a week. According to Joanna, she had seen Laura two or three times at the church, but Laura had never been to any of the Bible studies there. Joanna testified that she had seen Laura and Carlos's children at the church with Carlos, she had never seen him violent with them, and she described his demeanor around them as "[k]ind and loving and compassionate." Joanna testified that she did not have children, but that if she did, Carlos would be someone that she would allow around her children. She acknowledged that she had been around Carlos at church and in public, but she had never been at his house and observed him there with his children.

21

Analysis

In one issue, Carlos challenges the sufficiency of evidence supporting the trial court's finding that family violence is likely to occur in the future. According to Carlos, the trial court "never provided a 'factual' basis" for the finding and made no findings of fact as to what evidence the court relied on in concluding that family violence is likely to occur in the future. Carlos argues that most of the cases applying the principle that "past behavior predicts future behavior" have distinguishable facts, that this principle that started in termination of parental rights cases is distinguishable in the protective order context, and that "a more objective standard that requires some proof in addition to the Family Violence[]" should be applied where "there must be some act or words or behavior that evidences the respondent's intent to act in the future."

It was for the trial court alone to determine the credibility of the witnesses. *See City of Keller*, 168 S.W.3d at 819. The trial court found that "various portions of [Carlos]'s testimony were not credible[.]" The trial court heard Laura's testimony of multiple incidents and a pattern of past abuse and violent behavior, and the trial court could have disbelieved Carlos's denials regarding the abuse. *See id.* The trial court also heard testimony from family and friends of Laura and Carlos and could have believed or disbelieved that testimony regarding the allegations of Carlos's violent behavior towards Laura. *See id.* As for Carlos's argument on appeal that the

22

trial court failed to give a factual basis for its finding that Carlos was likely to commit family violence in the future, the trial court found that Carlos has a history of aggressive behavior towards Laura, Carlos caused physical injury to Laura on more than one occasion, and that Carlos had committed family violence. In its conclusions of law, the trial court cited *Teel v. Shifflett* and *Banargent v. Brent* for the trial court's conclusion that in cases involving protective orders against family violence, evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue this behavior in the future. *See Teel*, 309 S.W.3d at 604 (past violent conduct can be competent evidence which is legally and factually sufficient to sustain a protective order, and the trial court could have reasonably concluded that future violence is likely to occur based on the testimony showing a pattern of violent behavior); *Banargent*, 2006 Tex. App. LEXIS 1561, at **3-4 (concluding that, in some instances, past family violence can support a finding that future family violence is likely to occur).

Carlos argues that, in protective order cases, a finding that family violence is likely to occur in the future should not be based merely on an inference from evidence of past family violence and that evidence of a respondent's intent to act in the future should be required. Carlos cites no legal authority for this argument. And, we have found none. The statute does not require that a "likelihood finding" be based on evidence of "an intent to act in the future." *See* Tex. Fam. Code Ann. §§

23

81.001, 85.001. In the context of family violence protective orders, past violent behavior can support a finding that future family violence is likely to occur. *Pleasant v. Black*, No. 05-20-01040-CV, 2022 Tex. App. LEXIS 1820, at *19 (Tex. App.—Dallas Mar. 17, 2022, no pet.) (mem. op.); *In re E.A.K.*, No. 05-16-00724-CV, 2017 Tex. App. LEXIS 5110, at *11 (Tex. App.—Dallas June 1, 2017, no pet.) (mem. op.); *In re Frasure*, No. 05-13-01667-CV, 2015 Tex. App. LEXIS 1057, at *17 (Tex. App.—Dallas Feb. 4, 2015, no pet.) (mem. op.); *In re F.K.M.*, No. 05-11-00276-CV, 2012 Tex. App. LEXIS 2138, at **8-9 (Tex. App.—Dallas Mar. 19, 2012, no pet.) (mem. op.); *Bruhl v. Roberts*, No. 09-08-00057-CV, 2009 Tex. App. LEXIS 6278, at **5-7 (Tex. App.—Beaumont Aug. 13, 2009, no pet.) (mem. op.); *In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.); *In re M.G.M.*, 163 S.W.3d at 201-02.

Carlos failed to demonstrate that there was no evidence to support the trial court's finding that family violence was likely to occur in the future. *See Graham Cent. Station, Inc.*, 442 S.W.3d at 263. Additionally, after weighing all the evidence, the evidence supporting the finding that family violence was likely to occur in the future was not so weak as to be clearly or manifestly unjust. *See In re M.G.M.*, 163 S.W.3d at 201. We find both legally and factually sufficient evidence existed for the trial court to find that family violence was likely to occur in the future. *See* Tex. Fam. Code Ann. § 85.001(a)(2).

We overrule Carlos's issue and affirm the trial court's order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on July 5, 2023
Opinion Delivered August 17, 2023

Before Golemon, C.J., Horton and Johnson, JJ.